IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIC L. YOUNG, ESQUIRE<br><br>Plaintiff,<br><br>v.<br><br>JAMES R. DUGAN, II, ESQUIRE<br><br>and<br><br>THE DUGAN LAW FIRM, APLC<br><br>Defendants. | CIVIL ACTION NO.:<br><br>JURY TRIAL DEMANDED |

Plaintiff, Eric L. Young, Esq. ("**Plaintiff**" or "**Young**"), by and through his undersigned counsel, Zarwin, Baum, DeVito, Kaplan & Schaer, P.C., hereby files this Complaint against Defendants, James R. Dugan, II, Esq. ("**Dugan**") and The Dugan Law Firm, APLC (the "**Dugan Firm**") (collectively, "**Defendants**"), and in support thereof, alleges as follows:

**<u>NATURE OF THE ACTION</u>**

1. This action arises out of Defendants' refusal to honor their fee agreement with Young after Young, in accordance with that agreement, procured clients to serve as named plaintiffs in a multidistrict class action which resulted in at least two settlement agreements together totaling nearly $500 million.

2. Young's clients authorized Young to engage co-counsel of Young's choice in Young's sole discretion.

3. In accordance with the terms of Young's agreement with Defendants, Young engaged Defendants as co-counsel in the class action, giving Defendants the opportunity to recover millions of dollars in attorneys' fees.

4. Per Young's agreement with Defendants, Defendants were to pay Young 10% of all attorneys' fees recovered in the litigation, in exchange for Young's procuring clients, engaging Defendants as co-counsel and certain other work performed by Young.

5. After Defendants used Young to secure Defendants' involvement in the case, Defendants then took control of the settlement discussions and secured additional fees for themselves, which they concealed from Young in an effort to cut him out of obtaining his percentage of those fees.

6. After Young learned about the secret fees through another attorney involved in the case, Young confronted Defendants, who admitted that they received additional fees and made a partial payment to Young which Defendants claimed was a portion of the fees Defendants obtained in connection with an approved settlement in the case, although Defendants still refused to tell Young exactly how much Defendants received from that settlement.

7. When Defendants made that partial payment, they promised Young that Defendants would pay Young in accordance with their agreement as the remaining parts of the case resolved.

8. Thereafter, another settlement agreement was reached with other defendants in the case which will, like the first agreement, result in millions of dollars in attorneys' fees to Defendants if approved by the Court.

9. Defendants have unequivocally stated to Young that they will not pay Young any percentage of the fees they received under that settlement or any other settlement or judgment obtained in the case, completely disavowing Defendants' end of the bargain after Young held up his end.

10. If not remedied, Defendants will be unjustly enriched to the tune of millions of dollars as a result of Young's efforts.

**THE PARTIES**

11. Young is a licensed attorney in the Commonwealth of Pennsylvania and is the owner of Young Law Group, P.C., located at 3031C Walton Road, Suite 301, Plymouth Meeting, Pennsylvania.

12. Young is also Senior Counsel at Miller Shah, LLP, located at 1845 Walnut Street, Philadelphia, Pennsylvania 19103.

13. At all times relevant hereto and prior to 2023, Young was domiciled in Pennsylvania.

14. In 2023, Young became a resident of Florida and remains so to date, although he still practices law primarily in Pennsylvania through firms headquartered in Philadelphia.

15. Upon information and belief, Dugan is a licensed attorney in the State of Louisiana.

16. Upon information and belief, Dugan is domiciled in the State of Louisiana.

17. Upon information and belief, the Dugan Firm is organized under the laws of the State of Louisiana as a Professional Law Corporation, with its principal place of business located at 365 Canal Street, Suite 1000, New Orleans, Louisiana 70130.

**JURISDICTION AND VENUE**

18. This Honorable Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

19. This Court has personal jurisdiction over Dugan pursuant to 42 Pa.C.S.A. § 5322 because the claims asserted in this Complaint arise out of Dugan's (i) transacting business in this Commonwealth, specifically contracting to supply services or things in this Commonwealth; (ii)

causing harm or tortious injury by an act or omission in this Commonwealth; (iii) causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth; and/or (iv) other minimum contacts with this Commonwealth.

20. Dugan's contact with this Commonwealth is sufficient to allow this Court to exercise jurisdiction over Dugan under the Constitution of the United States.

21. This Court has personal jurisdiction over the Dugan Firm pursuant to 42 Pa.C.S.A. § 5322 because the claims asserted in this Complaint arise out of the Dugan Firm's (i) transacting business in this Commonwealth, specifically contracting to supply services or things in this Commonwealth; (ii) causing harm or tortious injury by an act or omission in this Commonwealth; (iii) causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth; and/or (iv) other minimum contacts with this Commonwealth.

22. The Dugan Firm's contact with this Commonwealth is sufficient to allow this Court to exercise jurisdiction over Dugan under the Constitution of the United States.

23. This Court also has personal jurisdiction over the Dugan Firm pursuant to 42 Pa.C.S. § 5301(a)(2)(iii) because the Dugan Firm carries on a continuous and systematic part of its general business within this Commonwealth. For example, upon information and belief, the Dugan Firm regularly solicits clients and files cases in this Commonwealth, and, in that regard, has appeared as counsel in at least 168 cases filed in the Eastern District of Pennsylvania alone, many of which are still active.

24. Indeed, in a section of the Dugan Firm's website which touts its purported litigation victories, the Dugan Firm advertises approximately four cases venued in Pennsylvania.

25. By way of further example, the Dugan Firm maintained a more than fifteen-year business relationship with Young, a Pennsylvania attorney who, for almost the entire duration of that relationship, worked out of and resided in Pennsylvania.

26. In connection with that relationship, the Dugan Firm regularly collaborated with Young, as co-counsel and otherwise, on cases venued in this Commonwealth, and negotiated and entered into referral fee agreements with Young regarding cases filed in Pennsylvania.

27. Venue is proper in this district pursuant to 28 U.S.C.A. § 1391 because a substantial part of the events giving rise to the claims occurred in this judicial district. Specifically, the referral fee agreement at issue in this action came into being after Dugan solicited Young, through Young's Philadelphia law practice, to procure clients for a prospective class action that was intended to be, and ultimately was, filed in this District. Nearly all of the negotiations and discussions relating to that agreement took place while Young was located in this District.

## FACTUAL BACKGROUND

### A. The Parties' Business Relationship

28. Since the early 2000s, Young has represented self-funded third-party payor ("**TPP**") health benefit funds in a number of different class action cases, the majority of which cases were filed in Pennsylvania courts and/or involved Pennsylvania TPPs.

29. Since becoming aware of Young's niche client base more than fifteen years ago, Dugan has routinely solicited Young during the ensuing years to work with the Dugan Firm in class action cases, with Dugan's focus on Young's ability to secure plaintiffs for those cases.

### B. The Avandia Case and the Related Fee Agreement

30. The first case for which Dugan solicited Young to procure clients involved a drug known as Avandia.

31. In May 2010, Young and the Dugan Firm together filed a TPP healthcare fraud class action captioned *U.F.C.W. Local 1776 & Participating Employers H&W Fund v. GlaxoSmithKline, et al.*, 07-cv-1871 (E.D. Pa.) (the "**Avandia Case**").

32. Young secured the named plaintiff in the Avandia Case on the condition that the Dugan Firm pay him 10% of all attorneys' fees obtained by the Dugan Firm in the case, plus Young and his Philadelphia law firm's lodestar (*i.e.*, hours billed multiplied by hourly billing rates).

33. The parties further agreement that Young would not be responsible for advancing any case costs.

34. Defendants agreed to those terms verbally, which Young confirmed in writing in a July 27, 2010 email to Dugan.

**C. <u>Dugan Solicits Young to Procure Plaintiffs for the Opioid TPP Litigation and the Parties Enter Into a Contract Relating to Young's Compensation.</u>**

35. In the fall of 2017, Dugan contacted Young by telephone and asked him if he was interested in sourcing clients for and pursuing a class action on behalf of self-funded TPP benefit funds against opioid manufacturers, distributors, and pharmacies in connection with the adverse effects of the illegal marketing and sale of opioid products.

36. Young expressed interest, subject to his further investigation.

37. In or about October 2017, Young completed his investigation and spoke to Dugan by telephone about potentially moving forward.

38. Dugan told Young that he needed at least one TPP client to get the contingent fee class action litigation started.

39. During several telephone calls in October 2017, Dugan encouraged Young to work with the Dugan Firm and offered the same terms that had previously been agreed to in connection with the Avandia Case.

40. Specifically, Dugan agreed that, in exchange for Young securing a TPP fund client to act as a named plaintiff in the litigation, Young would receive 10% of all attorneys' fees received by Defendants in the case, plus Young and his Philadelphia law firm's lodestar.

41. Dugan further agreed that Young would not be responsible for advancing any case costs.

42. Young agreed to these terms.

43. In reliance on Dugan's promise and the parties' agreement, throughout October and November 2017, Young made recommendations to two of his clients, UFCW Northeastern Pennsylvania Health & Welfare Fund ("**UFCW NEPA**") and Sheet Metal Workers Union, Local 25 Health & Welfare Fund ("**SMW Local 25**"), that they act as named plaintiffs in pursuing class action claims against certain of the opioid manufacturers, distributors, and pharmacies who were responsible for the unlawful sales and marketing of opioids.

44. As a result, on Young's recommendation, both UFCW NEPA and SMW Local 25 retained Young and his Philadelphia law firm to file class action complaints on their behalf.

45. Dugan had no role in communicating with or securing UFCW NEPA's or SMW Local 25's agreement to act as named plaintiffs in the case and, as such, neither UFCW NEPA nor SMW Local 25 expressly retained Dugan or the Dugan Firm.

46. On the contrary, they authorized Young to engage co-counsel at his discretion.

**D. <u>The Opioid TPP Litigation</u>**

47. After both UFCW NEPA and SMW Local 25 retained Young, Young engaged Defendants as co-counsel in accordance with the terms of the agreement the parties reached in October 2017.

48. Young thereafter worked hand in hand with the Dugan Firm to draft and file two separate TPP opioid class action complaints on behalf of these funds.

49. Specifically, on November 9, 2017, Young facilitated the filing of two TPP class action complaints in the United States District Court for the Eastern District of Pennsylvania: *UFCW Health & Welfare Fund of Northeastern PA v. Purdue Pharma, et al.*, 17-cv-05078 (E.D. Pa.) and *Sheet Metal Workers Local No. 25 H&W Fund*, 17-cv-05079 (E.D. Pa.) (collectively, the "**Opioid TPP Litigation**").

50. On November 27, 2017, the above-referenced cases were transferred to a Multidistrict Litigation ("**MDL**") in the United States District Court for the Northern District of Ohio (the "**MDL Court**"), 17-cv-02804.

51. These cases were then consolidated for pre-trial proceedings with several hundred other similarly situated TPP cases.

52. With Young's support, the MDL Court appointed Dugan as a member of the Plaintiffs Executive Committee ("**PEC**") on behalf of TPP plaintiffs, including UFCW NEPA and SMW Local 25.

53. Between November 2017 and June 2023, the TPP cases in the MDL languished as the court adjudicated opioid claims other than those brought by TPPs.

### E. As a Result of Young's Efforts, the Court Selects UFCW NEPA and SMW Local 25 as Bellwether Plaintiffs in the Opioid TPP Litigation.

54. In early 2023, the MDL Court began the process of selecting TPP bellwether plaintiffs.

55. In or about June 2023, in numerous phone calls, Dugan asked Young if UFCW NEPA or SMW Local 25 would agree to act as bellwether plaintiffs in the MDL.

56. After consulting with his clients, Young informed Dugan that each of his clients was amenable to serving as bellwether plaintiffs.

57. Based upon the parties' agreement and Dugan's representations and promises, and after securing his clients' consent to serve as bellwether plaintiffs, Young began the process of preparing his clients for the bellwether selection process, including but not limited to, working with the Dugan Firm and other TPP plaintiffs' counsel to update UFCW NEPA's and SMW Local 25's fact sheets and gathering other critical documents and information necessary to ensure their eligibility for bellwether selection.

58. On or about October 20, 2023, Dugan informed Young by telephone and email that the MDL Court had concluded the bellwether selection process and selected UFCW NEPA and SMW Local 25.

59. Dugan noted the significance of the MDL Court's decision given that only four TPP bellwether cases were selected and that Young and Dugan would be working together on behalf of two of them.

60. From October 2023 through the present, Young served as primary counsel for bellwether plaintiffs UFCW NEPA and SMW Local 25.

61. At no point during the Opioid TPP Litigation did Dugan have any contact with any representatives of either UFCW NEPA or SMW Local 25.

62. Between October 2023 and August 2026, Young and his associates collaborated with not only the Dugan Firm, but counsel for the other two TPP bellwether plaintiffs including, but not limited to, handling all client counseling and communications, working with the clients to retrieve claims data and relevant documents dating back to 1996, drafting and revising bellwether plaintiffs' pleadings, drafting and revising responses to defendants' numerous discovery requests,

and searching and reviewing all of UFCW NEPA's and SMW Local 25's document databases to prepare for document productions.

**F. <u>The Distributor Settlement and the $60 Million Contingent Fee.</u>**

63. In the Opioid TPP Litigation, as Young recently learned, plaintiffs' counsel are compensated in two ways in connection with settlement agreements.

64. First, settlements have provided a certain amount of contingent fees to be paid on a percentage basis to attorneys that have written contingent fee agreements with their clients.

65. Second, a portion of the court-approved contingent fees are paid into a common benefit fund and a court-appointed fee panel later reviews applicants' detailed time and expense submissions before deciding which attorneys or law firms should get paid attorneys' fees or costs.

66. Plaintiffs' attorneys that have written contingent fee agreements with their clients can be compensated in both ways.

67. In the early summer of 2024, Dugan informed Young that there were settlement discussions taking place among lead counsel involving some of the defendants in the Opioid TPP Litigation.

68. Dugan referred to it as the "Distributor Settlement," and advised Young that Dugan would be acting as Co-Lead Class Settlement Counsel, along with Elizabeth Cabraser from Lieff Cabraser Heimann & Bernstein, LLP, and Paul Geller from Robbins Geller Rudman & Dowd, LLP.

69. On August 30, 2024, Co-Lead Settlement Class Counsel, including Dugan, filed a Motion to Approve Class Action Distributor Settlement in the amount of $300 million, which sought approval of a 20% contingent fee (amounting to $60 million) for Co-Lead Counsel.

70. In an Order dated January 15, 2025, the MDL Court approved the Distributors' Settlement, including the requested $60 million contingent fee.

71. The MDL Court allocated the $60 million fee as follows: (a) $22.5 million into the Common Benefit Fund, for allocation by the Fee Panel, and (b) $37.5 million to be allocated among (1) counsel representing and working for the benefit of the class and/or litigating Bellwether plaintiff); and (2) counsel representing individual class member TPPs, in a manner privately agreed upon by Co-Lead Settlement Class Counsel.

**G. <u>Dugan's Misrepresentations Regarding the Fee Allocation</u>**

72. In multiple telephone conversations during negotiations and after the motion to approve the Distributors' Settlement, was filed and ultimately approved, Dugan misled Young into believing that all of the contingent fees to be paid to TPP bellwether counsel would be allocated by a court-appointed fee panel.

73. Unbeknownst to Young at that time, Dugan had already negotiated an agreement with other TPP Co-Lead Settlement Class Counsel on how the $37.5 million contingent fee would be divided, separate and apart from the fee panel process.

74. On or about February 16, 2025, Young sent a text message to Dugan regarding the substantial amount of time Young and his firm were spending on the bellwether cases in the Opioid TPP Litigation and Young's concerns about receiving adequate compensation for that time.

75. A phone call resulted from this text message, during which Young reiterated his concerns about ensuring that he was properly compensated for the substantial time and effort he and his firm expended.

76. Dugan assured Young during this call that Young's time would be "protected" through Young's submitting an application to the court-appointed fee panel at the appropriate time.

77. Dugan further stated that Young's compensation was protected through Defendants' agreement to pay Young 10% of all attorneys' fees that Defendants received in the case.

78. On April 3, 2025, Young again texted Dugan, resulting in another phone call. As he did in the previous call with Dugan in February, Young again expressed concern about not receiving compensation for all of his and his associates' work.

79. Dugan advised Young that he should let Defendants do all of the work going forward and that Young would be adequately compensated regardless given that Dugan had agreed to pay Young 10% of his fees in the case.

80. At no point during any of Young's and Dugan's conversations from February through April of 2025 did Dugan tell Young that he had already been in discussions with Co-Lead Settlement Class Counsel on how to allocate the contingent fee portion of the $60 million attorneys' fee in the Distributors' Settlement, outside the fee panel process.

81. On September 16, 2025, on Dugan's invitation, Young travelled to Destin, Florida to fish on Dugan's 74-foot Viking sport fishing yacht.

82. While fishing, Young specifically asked Dugan for an update as to the payment of attorneys' fees in relation to the Distributors' Settlement.

83. Dugan responded again that upon the MDL Court's request, TPP plaintiffs' bellwether counsel would submit a fee petition to the fee panel.

84. Dugan again did ***not*** disclose the fact that he had already been in discussions with other TPP Co-Lead Settlement Class Counsel about how to allocate the contingent fee portion ($37.5 million) of the Distributors' Settlement, despite that he had agreed to pay Young 10% of any attorneys' fees received by Dugan Firm and despite that Young and Dugan had numerous

discussions about the importance of the 10% agreement to Young and his continued involvement in the litigation.

85. On September 25, 2025, Young was contacted by an associate of the Dugan Firm who asked Young to provide the amount of case costs expended by Young for both UFCW NEPA and SMW Local 25.

86. Young thereafter asked Dugan why this information was being requested at that time and if there was anything Young needed to do to make sure he and his firm would be paid for the time and expense they incurred working on the case.

87. Dugan again falsely represented to Young several times that no fees would be distributed until the court-appointed fee panel applications were requested, without disclosing that Dugan was neck deep in discussions with other TPP Co-Lead Settlement Class Counsel about how to allocate the contingent fee portion ($37.5 million) of the Distributors' Settlement outside of the fee panel process.

88. For example, in a text dated September 25, 2025, Young asked Dugan, "[D]o I need to do anything to get my time submitted? I have been up-to-date on submitting it to the portal." Dugan responded, "Not yet."

89. After these exchanges, Young suspected that Dugan was not giving him complete or accurate information.

90. Young then proceeded to review the case docket on PACER to review the details of the Distributor Settlement.

**H. Young Learns the Truth.**

91. On October 1, 2025, after having reviewed the details of the Distributor Settlement on the case docket, Young contacted a former colleague who is also involved in the TPP Opioid Litigation on behalf of several large stakeholders.

92. Due to the nature of Young's former colleague's representation, he is privy to certain non-public information regarding the negotiation of settlement agreements and division of contingent attorneys' fees and costs amongst TPP plaintiffs' counsel.

93. In an October 1, 2025 phone call, Young's former colleague informed Young that a substantial amount of the $60 million contingent fee in the Distributors' Settlement was to be paid outside of the fee panel process due to how the settlement was structured.

94. Young was also informed that Dugan had already agreed to how those monies would be allocated between other TPP plaintiff bellwether counsel, including, but not limited to, Robbins Geller, Lieff Cabraser, and the Dugan Firm.

95. Young was further informed that the Dugan Firm was expected to receive between $6 million and $7 million outside the fee panel process and that payment of those fees was imminent.

96. On that same day, following Young's phone call with his former colleague, Young texted Dugan asking to speak to him.

97. A phone call resulted during which Young questioned Dugan about what Young had just learned that day from his former colleague.

98. Dugan confirmed that the MDL Court had approved a $60 million contingent fee in the Distributors' Settlement and admitted that Defendants were set to receive an agreed-upon portion of that money, separate and apart from the fee-panel process.

99. Young asked Dugan to confirm that Young would receive 10% of any fees paid to Defendants.

100. Dugan agreed but questioned whether Defendants' costs should be deducted from the gross amount before calculating the 10%.

101. Young disagreed and pointed out that Defendants would likely be reimbursed for all of their costs from the fee panel process.

102. During this call, Dugan agreed that he would pay Young between $500,000 and $600,000 based upon their 10% agreement.

103. Following that phone call, Young asked for confirmation as to when Dugan received the money.

104. On October 3, 2025, Dugan texted Young, "No money yet for disbursal will keep you posted."

105. On October 9, 2025, Young called Dugan for an update, during which call Dugan led Young to believe that he still had not received the Dugan Firm's portion of the $37.5 million contingent fee as part of the Distributors' Settlement.

106. During the same October 9 call, Dugan stated that 10% of what he expected to receive would likely result in Dugan paying Young between $500,000 and $600,000, but claimed that he could not tell Young exactly how much the Dugan Firm was to receive because, according to Dugan, he was still working through some issues with Co-Lead Settlement Class Counsel.

107. On October 14, 2025, Young again spoke to his former colleague who confirmed that Co-Lead Class Settlement Counsel, including Defendants, had received their share of the $37.5 million contingent fee as part of the Distributors' Settlement.

## I. The Capital Grille Meeting and Dugan's Partial Payment to Young.

108. On October 22, 2025, at Dugan's request, Dugan and Young met at the Capital Grille in Boca Raton, Florida, for the express purpose of discussing how much Defendants owed Young based upon their agreement that Young get 10% of all attorneys' fees paid to Defendants in the Opioid TPP Litigation.

109. During that discussion, Dugan acknowledged his and Young's prior agreement and agreed that he owed Young 10% of the attorneys' fees received by Defendants.

110. However, Dugan refused to say exactly how much Defendants received, while claiming that Defendants had significant case costs that should be factored into any payment made to Young.

111. Before agreeing to a specific amount to be paid to Young, Dugan again questioned whether the 10% should be calculated based on the gross amount of attorneys' fees or net of the costs that Defendants incurred in connection with the Distributors' Settlement.

112. Young responded that his fee should be calculated on the gross amount received by Defendants, without netting out Defendants' costs.

113. Dugan then pulled out his checkbook and offered to pay Young a partial payment of $500,000, pending resolution of the remaining parts of the case.

114. Dugan further stated that once the rest of the case settled, he would ensure that Young was made whole in accordance with their agreement.

115. Based on those representations, Young conditionally accepted the partial payment of $500,000.

**J. The Pharmacy Settlement and the Opening of the Common Benefit Fund Application Process.**

116. On or about March 31, 2026, Dugan emailed Young and informed him that TPP Co-Lead Class Settlement Counsel had negotiated a settlement involving remaining defendants, Allergan, Janssen, Teva, CVS, Walgreens, and Walmart ("**Pharmacy Settlement**").

117. At that time, Dugan disclosed to Young that the pending Pharmacy Settlement was for $180 million and that TPP Co-Lead Class Settlement Counsel would be working on drafting motions for court approval.

118. If approved by the court, the Pharmacy Settlement would end each of the four TPP bellwether cases. It would also mean that Defendants would no longer need to rely on Young to ensure that Young's clients, UFCW NEPA and SMW Local 25, approved all of the terms and conditions of the settlements in the Opioid TPP litigation, as they would be out of the case.

**K. Defendants Absolutely and Unequivocally Repudiate their Agreement with Young.**

119. On May 1, 2026, the court-approved fee panel issued an Order opening the application process for awards from the Common Benefit Fund relating to the Opioid TPP Litigation.

120. The Order set a deadline for submittals on or before June 1, 2026.

121. Throughout May of 2026, Young reached out to Dugan and an associate of the Dugan Firm about coordinating position statements with regard to applications to the fee panel, particularly given that the application process required the disclosure of all referral fee arrangements in the Opioid TPP Litigation.

122. Young shared with Defendants a draft of his application to the fee panel and asked Defendants to share theirs to ensure consistent positions.

123. Despite numerous requests, Defendants did not and, to date, have not shared a copy of their fee application with Young.

124. On or about May 31, 2026, after learning that Young had disclosed the referral agreement between Young and Defendants in Young's fee application, Dugan shockingly disavowed the parties' agreement and informed Young, for the first time, that he did not intend to honor the parties' 10% referral agreement going forward.

125. On June 4, 2026, Dugan and Young spoke by phone at which point Dugan again falsely claimed that he never entered into a referral agreement with Young, that he would not pay Young any additional fees in the Opioid TPP Litigation and that any additional fees paid to Young would have to come at the discretion of the fee panel.

126. On June 12, 2026, TPP Co-Lead Class Settlement Counsel, including Cabraser, Geller, and Defendants, filed a Motion for Third Party Payor Plaintiffs for Preliminary Approval of the Pharmacy Settlement.

127. On June 16, 2026, the MDL Court granted said Motion, including Co-Lead Settlement Counsel's request for $36 million in contingent attorneys' fees.

128. On July 24, 2026, Co-Lead Class Settlement Counsel filed a Motion for Final Approval of the Pharmacy Settlement.

129. In response, the MDL Court ordered a Fairness Hearing to take place on September 23, 2026.

130. The Fairness Hearing proceeded on September 23, 2026, and the MDL Court thereafter entered an Order approving the Pharmacy Settlement that same day.

**COUNT I – DECLARATORY JUDGMENT**
**(Against Dugan and the Dugan Firm)**

131. Young hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

132. In October 2017, Defendants and Young entered into a contract whereby Defendants agreed that, in consideration for Young's procuring a TPP fund client to act as a named plaintiff in the Opioid TPP Litigation and engaging Defendants as co-counsel, Defendants would pay Young 10% of all attorneys' fees received by Dugan and/or the Dugan Firm in the case, in addition to Young's and his law firm's lodestar.

133. Defendants further agreed that Young would not be responsible for advancing any case costs.

134. This agreement was based on the same terms that the parties had previously agreed to in the Avandia case.

135. Young performed his obligations under the contract by securing two TPP fund clients, UFCW NEPA and SMW Local 25, who agreed to act as named plaintiffs in the Opioid TPP Litigation.

136. Young further performed by engaging Defendants as co-counsel and facilitating the filing of two TPP class action complaints on behalf of these funds in this Court on November 9, 2017.

137. In January 2025, the MDL Court approved the Distributors' Settlement, including a $60 million contingent fee.

138. Upon information and belief, Defendants received between $6 million and $7 as part of the Distributors' Settlement.

139. Under the parties' contract, Young is entitled to receive 10% of all attorneys' fees paid to Defendants, which amounts to between $600,000 and $700,000 from the Distributors' Settlement alone.

140. Defendants paid Young only $500,000 and promised that Young would receive additional funds as the remaining parts of the case settled, consistent with the terms of the parties' agreement.

141. In June 2026, the court granted preliminary approval of the $180 million Pharmacy Settlement, including $36 million in contingent attorneys' fees.

142. Upon information and belief, Defendants are expected to receive a substantial portion of the contingent fees from the Pharmacy Settlement.

143. Despite repeated requests, Defendants have refused to pay Young the full amount in accordance with the terms of their contract.

144. On or about May 31, 2026, and again on June 4, 2026, Defendants repudiated the parties' contract and stated that they would not pay Young any additional fees in the Opioid TPP Litigation, despite Defendants' receipt and/or expected receipt of additional funds.

145. The Declaratory Judgment Act ("**DJA**"), 28 U.S.C. §§ 2201 and 2202, creates a remedy by which federal courts "may declare the rights and other legal relations of any interested party seeking such declaration" when there is a "case of actual controversy." 28 U.S.C. § 2201.

146. To obtain a declaratory judgment, the dispute between the parties must be ripe for judicial intervention.

147. Ripeness is evaluated by examining (1) the adversity of the parties' interests, (2) the conclusiveness of the judicial judgment, and (3) the utility, or practical help, of a judgment.

148. It is not necessary for the party seeking review to have suffered a completed harm in order to establish adversity of interest so long as there is a substantial threat of real harm that remains throughout the course of the litigation.

149. All of the ripeness factors are present here.

150. Specifically, the parties have adverse legal interests regarding whether Defendants are obligated to pay Young 10% of all attorneys' fees received by Dugan and/or the Dugan Firm in the TPP Opioid Litigation.

151. The issue lends itself to a conclusive judgment as there are concrete factual issues to be resolved.

152. Finally, such a declaratory judgment would have utility to the parties in resolving their disputes as to the fees to which Young is entitled in connection with the TPP Opioid Litigation.

153. Accordingly, this issue is ripe for adjudication under the DJA.

**COUNT II – ANTICIPATORY BREACH OF CONTRACT**

154. Young hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

155. A claim for anticipatory breach exists where there is an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so.

156. A statement by a party that he will not or cannot perform in accordance with an agreement creates such a breach.

157. To bring a claim for breach of contract based on an anticipatory repudiation, the non-breaching party may either opt to afford the repudiator an opportunity to recant and perform by awaiting performance, in which case the cause of action accrues and the statute of limitation

begins to run at the time performance is due, or may elect to place the repudiating party in breach immediately.

158. In October 2017, Defendants and Young entered into a contract whereby Defendants agreed that, in consideration for Young's procuring a TPP fund client to act as a named plaintiff in the Opioid TPP Litigation and engaging Defendants as co-counsel, Defendants would pay Young 10% of all attorneys' fees received by Dugan and/or the Dugan Firm in the case, in addition to Young's and Young's law firm's lodestar.

159. Defendants further agreed that Young would not be responsible for advancing any case costs.

160. This agreement was based on the same terms that the parties had previously agreed to in the Avandia case.

161. Young performed his obligations under the contract by securing two TPP fund clients, UFCW NEPA and SMW Local 25, who agreed to act as named plaintiffs in the Opioid TPP Litigation.

162. Young further performed by engaging Defendants as co-counsel and facilitating the filing of two TPP class action complaints on behalf of these funds in this Court on November 9, 2017.

163. In January 2025, the MDL Court approved the Distributors' Settlement, including a $60 million contingent fee.

164. Upon information and belief, Defendants received between $6 million and $7 as part of the Distributors' Settlement.

165. Under the parties' contract, Young is entitled to receive 10% of all attorneys' fees paid to Defendants, which amounts to between $600,000 and $700,000 from the Distributors' Settlement alone.

166. Defendants paid Young only $500,000 and promised that Young would receive additional funds as the remaining parts of the case settled, consistent with the terms of the parties' agreement.

167. In June 2026, the court granted preliminary approval of the $180 million Pharmacy Settlement, including $36 million in contingent attorneys' fees.

168. Upon information and belief, Defendants are expected to receive a substantial portion of the contingent fees from the Pharmacy Settlement.

169. Despite repeated requests, Defendants have refused to pay Young the full amount in accordance with the terms of their contract.

170. On or about May 31, 2026, and again on June 4, 2026, Defendants absolutely and unequivocally refused to perform under the parties' contract, expressly stating to Young that neither Dugan nor the Dugan Firm would pay Young any additional fees in the Opioid TPP Litigation, despite Defendants' receipt and/or expected receipt of additional funds.

171. Defendants are expected to receive millions more in attorneys' fees in the Opioid Litigation but have unmistakably stated that they refuse to pay Young any portion of those fees in contravention of the parties' agreement.

172. As the non-breaching party, Young is entitled to place the repudiating party (here, Defendants) in breach immediately.

**COUNT III – BREACH OF CONTRACT**
**(Against Dugan and the Dugan Firm)**

173. Young hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

174. In October 2017, Defendants and Young entered into a contract whereby Defendants agreed that, in consideration for Young's procuring a TPP fund client to act as a named plaintiff in the Opioid TPP Litigation and engaging Defendants as co-counsel, Defendants would pay Young 10% of all attorneys' fees received by Dugan and/or the Dugan Firm in the case, in addition to Young's and Young's law firm's lodestar.

175. Dugan further agreed that Young would not be responsible for advancing any case costs.

176. This agreement was based on the same terms that the parties had previously agreed to in the Avandia case.

177. Young performed his obligations under the contract by securing two TPP fund clients, UFCW NEPA and SMW Local 25, who agreed to act as named plaintiffs in the Opioid TPP Litigation.

178. Young further performed by engaging Defendants as co-counsel and facilitating the filing of two TPP class action complaints on behalf of these funds in this Court on November 9, 2017.

179. In January 2025, the MDL Court approved the Distributors' Settlement, including a $60 million contingent fee.

180. Upon information and belief, Defendants received between $6 million and $7 as part of the Distributors' Settlement.

181. Under the parties' contract, Young is entitled to receive 10% of all attorneys' fees paid to Defendants, which amounts to between $600,000 and $700,000 from the Distributors' Settlement alone.

182. Defendants paid Young only $500,000 in breach of the parties' agreement.

183. Additionally, Defendants have received or are imminently expected to receive a substantial portion of the contingent fees from the Pharmacy Settlement.

184. Defendants have refused to pay Young any percentage of these fees in violation of the terms of the parties' agreement.

185. Defendants have breached the contract by failing to pay Young 10% of all attorneys' fees received by Defendants in the Opioid TPP Litigation.

186. As a direct and proximate result of Defendants' breach, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to unpaid fees owed under the agreement, which exceeds $75,000.

**COUNT IV — DETRIMENTAL RELIANCE/PROMISSORY ESTOPPEL**
**(Against Dugan and the Dugan Firm)**

187. Young hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

188. In October 2017, Defendants made a clear and unambiguous promise to Young that, in consideration for Young's procuring a TPP fund client to act as a named plaintiff in the Opioid TPP Litigation and engaging Defendants as co-counsel, Defendants would pay Young 10% of all attorneys' fees received by Dugan and/or the Dugan Firm in the case, in addition to Young's and Young's law firm's lodestar.

189. Defendants made this promise with the intent and reasonable expectation that Young would rely upon it and that such promise would induce Young to procure clients, engage

Defendants as co-counsel and devote substantial time and resources to pursuing the Opioid TPP Litigation.

190. Young did in fact rely upon Defendants' promise to his detriment.

191. Specifically, in reasonable reliance on Defendants' promise, Young recommended to two of his longstanding clients, UFCW NEPA and SMW Local 25, that they act as named plaintiffs in the Opioid TPP Litigation.

192. In reasonable reliance on Defendants' promise, Young secured the retention of both UFCW NEPA and SMW Local 25 as clients to file class action complaints on their behalf.

193. In reasonable reliance on Defendants' promise, Young facilitated the filing of two TPP class action complaints in this Court on November 9, 2017.

194. In reasonable reliance on Defendants' promise, Young engaged Defendants as co-counsel.

195. In reasonable reliance on Defendants' promise, Young worked hand in hand with Defendants to draft and file the two separate TPP class action complaints.

196. In reasonable reliance on Defendants' promise, Young consented to his clients serving as bellwether plaintiffs after Dugan requested that they do so in June 2023.

197. In reasonable reliance on Defendants' promise, Young prepared his clients for the bellwether selection process, including working with Defendants and other TPP plaintiffs' counsel to update fact sheets and gather critical documents and information.

198. In reasonable reliance on Defendants' promise, from October 2023 until the present, Young served as primary counsel for bellwether plaintiffs UFCW NEPA and SMW Local 25 and performed extensive legal work on their behalf.

199. Young's reliance on Defendants' promise was reasonable under the circumstances because the parties had previously entered into an identical agreement in the Avandia case.

200. From February 2025 through September 2025, Dugan repeatedly assured Young that his time would be "protected" and that Young would be fully compensated as promised.

201. On October 1, 2025, Dugan confirmed his promise that Young would receive 10% of any fees paid to Defendants.

202. At the October 22, 2025, Capital Grille meeting, Defendants agreed that they owed Young 10% of all attorneys' fees received by Defendants, and paid Young $500,000, while promising to ensure that Young would receive the promised portion of any additional fees as they were received.

203. Young continued to rely on Defendants' promises by continuing to perform legal work on the bellwether cases through the present.

204. Injustice can be avoided only by enforcement of Defendants' promise.

205. As a direct and proximate result of Young's detrimental reliance on Defendants' promise, Young has suffered damages in an amount to be proven at trial, including but not limited to the value of the legal services he provided and the fees he was promised, which exceeds $75,000.

**COUNT V — UNJUST ENRICHMENT**
**(Against Dugan and the Dugan Firm)**

206. Young hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

207. Unjust enrichment is an equitable remedy, defined as the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, and for which the beneficiary must make restitution.

208. Young conferred a benefit upon Defendants by:

(a) securing two TPP fund clients, UFCW NEPA and SMW Local 25, who agreed to act as named plaintiffs in the Opioid TPP Litigation, per Defendants' request;

(b) engaging Defendants as co-counsel on the cases, thereby enabling Defendants to participate in the litigation and ultimately receive substantial attorneys' fees;

(c) working hand in hand with Defendants to draft and file the two separate TPP class action complaints;

(d) supporting Defendants' appointment as a member of the Plaintiffs Executive Committee on behalf of TPP plaintiffs;

(e) consenting to Young's clients serving as bellwether plaintiffs after Defendants requested that they do so in June 2023;

(f) preparing Young's clients for the bellwether selection process, including working with Defendants and other TPP plaintiffs' counsel to update fact sheets and gather critical documents and information;

(g) serving as primary counsel for bellwether plaintiffs UFCW NEPA and SMW Local 25 from October 2023 until the present;

(h) handling all client counseling and communications, working with clients to retrieve claims data and relevant documents dating back to 1996, drafting and revising bellwether plaintiffs' responses to defendants' numerous discovery requests, and searching and reviewing all of UFCW NEPA and SMW Local 25's document databases to prepare for document productions.

209. At no point during the Opioid TPP Litigation did Defendants have any contact with any representatives of either UFCW NEPA or SMW Local 25.

210. Defendants appreciated and had knowledge of the benefits conferred upon them by Young.

211. Defendants accepted and retained the benefits conferred upon them by Young.

212. As a result of the benefits conferred by Young, Defendants received between $6 million and $7 million from the Distributors' Settlement and are expected to receive a substantial portion of the contingent fees from the Pharmacy Settlement.

213. Under the circumstances, it would be inequitable and unjust for Defendants to retain the benefits conferred by Young without paying Young the compensation he is owed.

214. Defendants have been unjustly enriched at Young's expense.

215. As a direct and proximate result of Defendants' unjust enrichment, Young has suffered damages in an amount to be proven at trial, including but not limited to the reasonable value of the services and benefits conferred upon Defendants, which exceeds $75,000.

**COUNT VI – FRAUD**
**(Against Dugan and the Dugan Firm)**

216. Young hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

217. Defendants knowingly made material misrepresentations of existing fact to Young with the intent to induce Young's reliance, and Young justifiably relied on those misrepresentations to his detriment.

218. In multiple telephone conversations between the summer of 2024 and April 2025, Defendants misled Young into believing that all of the contingent fees to be paid to TPP bellwether counsel would be allocated through the fee panel process.

219. This representation was false because, unbeknownst to Young at that time, Defendants had already negotiated an agreement with other TPP Co-Lead Settlement Class Counsel on how the $60 million contingent fee would be divided amongst counsel, with $37.5 million to be allocated outside of the fee panel process.

220. On February 16, 2025, during a phone call, Defendants assured Young that Young and his firm's time would be "protected" through Young submitting a request to the court appointed fee panel at the appropriate time, when in fact Defendants knew that a substantial portion of the fees would be allocated outside of the fee panel process.

221. On April 3, 2025, during a phone call, Defendants again told Young that Young should let Defendants do all of the work and that Young would be compensated regardless given that Defendants had agreed to pay Young 10% of his fees in the case, when in fact Defendants knew that he had already been in discussions with Co-Lead TPP counsel on how to allocate the contingent fee portion of the $60 million attorneys' fee in the Distributors' Settlement.

222. At no point during any of Defendants' conversations with Young from February through April of 2025 did Defendants tell Young that they had already been in discussions with Co-Lead TPP counsel on how to allocate the contingent fee portion ($37.5 Million) of the Distributors' Settlement.

223. On September 16, 2025, while fishing on Dugan's yacht in Destin, Florida, Young specifically asked Dugan for an update as to the payment of attorneys' fees in the Distributors' Settlement.

224. Dugan again represented that, upon request, TPP plaintiffs' bellwether counsel would submit a fee petition to the fee panel upon request, when in fact Dugan knew that a separate imminent payment of contingent fees to attorneys who worked on the TPP bellwether cases was

about to occur and that he had already been in discussions with other TPP Co-Lead Class Settlement counsel about how to allocate the contingent fee portion ($37.5 Million) of the Distributors' Settlement.

225. Dugan did not mention anything about the separate imminent payment of contingent fees or his prior discussions with other counsel.

226. On September 25, 2025, when Young asked Dugan whether Young needed to take any action to obtain compensation for the time and expenses Young and his firm incurred in connection with the TPP Opioid Litigation, Dugan again told Young that no fees would be distributed until the court-appointed fee panel applications were requested and responded, "Not yet," when in fact Dugan knew that fees had already been or were about to be allocated outside of the fee panel process.

227. On October 3, 2025, Dugan texted Young, "No money yet for disbursal will keep you posted," when in fact, upon information and belief, Defendants had already received or were about to receive its portion of the $60 million contingent fee.

228. On October 9, 2025, Defendants led Young to believe that they still had not received Defendants' portion of the $60 Million contingent fee as part of the Distributors' Settlement, when in fact, upon information and belief, Defendants had already received their share of the fees.

229. At the Capital Grille meeting on October 14, 2025, Dugan refused to say exactly how much Defendants received while questioning whether costs should be deducted from the gross amount before calculating the 10%, when in fact Dugan knew exactly how much Defendants had received.

230. Defendants made each of these false representations knowing them to be false or with reckless disregard for their truth or falsity.

231. Defendants made these false representations with the intent to induce Young to maintain Defendants' engagement as co-counsel to UFCW NEPA and SMW Local 25, which are Young's clients and which entrusted Young to engage co-counsel within his discretion.

232. Defendants made these false representations with the intent to deceive Young as to the timing and manner of fee distributions so that Young would not take action to protect his interests.

233. Young justifiably relied on Defendants' representations in continuing to provide extensive legal services on behalf of the bellwether plaintiffs.

234. Young justifiably relied on Defendants' representations in maintaining Defendants' engagement as co-counsel to UFCW NEPA and SMW Local 25, which are Young's clients and which entrusted Young to engage co-counsel within his discretion.

235. Young justifiably relied on Defendants' representations in not demanding immediate payment of all fees owed to him.

236. Young's reliance was justified because Defendants had honored their previous agreement in the Avandia case and because Defendants held themselves out as Young's partner and co-counsel throughout the litigation.

237. As a direct and proximate result of Defendants' fraudulent misrepresentations, Young has suffered damages in an amount to be proven at trial, including but not limited to unpaid fees owed under the parties' agreement, the value of legal services provided in reliance on the misrepresentations, and other damages, which exceeds $75,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Eric L. Young, Esq., respectfully requests that this Court enter judgment in his favor and against Defendants, James R. Dugan, II, Esq. and The Dugan Law Firm, APLC, as follows:

A. A declaratory judgment that Defendants were and are required to pay Young 10% of any and all gross attorneys' fees received or to be received by Dugan and/or the Dugan Firm in connection with the Opioid TPP Litigation, including, but not limited to, all contingent fees, all fees paid out of any Common Benefit Fund, all fees paid outside of a fee panel process and all fees awarded via the fee panel or other court-approved process;

B. A declaratory judgment that Defendants anticipatorily breached to parties' agreement whereby Defendants agreed to pay Young 10% of any and all gross fees received or to be received by Dugan and/or the Dugan Firm in connection with the Opioid TPP Litigation;

C. Awarding Young damages in an amount to be proven at trial, including compensatory and punitive damages, together with pre-judgment and post-judgment interest as permitted by law;

D. Awarding Young the costs of this action, together with reasonable attorney's fees;

E. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

**ZARWIN, BAUM, DeVITO,**
**KAPLAN & SCHAER, P.C.**

/s/ *Anthony R. Twardowski*
ANTHONY R. TWARDOWSKI, ESQ.
CHELSEA P. ABRAMS, ESQ.
Attorney I.D. Nos: 37762 / 319539
2005 Market Street, 16th Floor
Philadelphia, PA 19103
P: 215.569.2800
F: 215.569.1606
artwardowski@zarwin.com
cabrams@zarwin.com
*Attorneys for Plaintiff*

Dated: September 23, 2026